UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*******************************************
CITY OF QUINCY,
   Plaintiff

Civil Action No.:

v.

SOTIRIS EMMANUEL
 a/k/a SOTIRIOS EMMANOUIL,
MHI SHIPBUILDING, LLC and
MASSACHUSETTS HEAVY
  INDUSTRIES, INC.
   Defendants
*******************************************



## MEMORANDUM IN SUPPORT OF CITY OF QUINCY'S MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

Plaintiff City of Quincy (the "City") files this Memorandum in support of its Motion for a Temporary Restraining Order, or In the Alternative, a Preliminary Injunction to prohibit Defendant Sotiris Emmanuel ("Emmanuel") from taking, transferring or otherwise disposing of approximately $650,000 in stock certificates he owns in Universal Guardian Corporation. Emmanuel, through two of seven corporations he created in the mid-late 1990's, obtained $7.8 million in public funds from the City of Quincy based on false representations about his ability to renovate the Fore River Shipyard in Quincy, Massachusetts (the "Fore River Shipyard") and restore shipbuilding operations to the Shipyard. He never completed the renovations, never brought any shipbuilding back to Quincy and has never paid any of the $7.8 million back to the City. Upon information and belief, Emmanuel fled the United States to avoid his obligations. Because Emmanuel personally controlled all of these seven corporations, failed to

observe the proper corporate formalities and utilized these corporations to perpetuate a fraud on the City, it is proper for this Court to preliminarily attach his Universal Guardian Corporation stock, which has a value of less than 10% of the total amount owed to the City, until the Defendants' liability to the City can be resolved.

## FACTS

In the mid - to late 1990s, Emmanuel, a Greek citizen, began to attract the attention of local, state and federal officials with his promise of renovating and operating the Fore River Shipyard. Emmanuel claimed to have a background in the operation of major shipbuilding facilities in Greece and claimed to have reliable commitments of future shipbuilding contracts to support operations at a new, revitalized Fore River Shipyard. Because the Fore River Shipyard -- a tract of industrial land of approximately 110 acres -- had largely sat idle since the mid-1980's, the City responded positively to Emmanuel's overtures and, in December 1997, lent him $7.8 million of public funds.

Specifically, the City borrowed $7.8 million against its future federal Community Development Block Grant ("CDBG") funds and lent that money to two corporations set up by Emmanuel, MHI Shipbuilding, LLC ("MHI Shipbuilding") and Massachusetts Heavy Industries, Inc. ("MHI") (collectively, the "Corporate Defendants."). Emmanuel executed inter alia, a Loan Agreement, a Note, and a Guaranty (collectively, the "Financing Documents") on behalf of both corporate defendants. Under the Loan Agreement, MHI Shipbuilding was the Borrower and both it and MHI were the Obligors. Emmanuel executed the documents as the President of both MHI Shipbuilding and MHI. True and accurate copies of the Financing Documents are attached hereto as Exhibit 1.

The Note called for repayment of the $7.8 million (the "City Loan") in increasing principal amounts, beginning in 2000. The Note also provided for the payment of interest at a rate to be established through the Federal Housing and Urban Development Section 108 Program. Under the Guarantee, MHI agreed to perform all of MHI Shipbuilding's obligations under the Loan Agreement in the event of a default by MHI Shipbuilding.

In addition to the $7.8 million that he obtained from the City, Emmanuel also borrowed significant sums from other public entities. Those funds were to be spent on revitalizing the Fore River Shipyard. In total, Emmanuel borrowed more than $50 million dollars from public entities for revitalization of the Fore River Shipyard.

In addition to the two Defendant Corporations, Emmanuel established five other corporations, all with a business address at 115 East Howard Street in Quincy, Massachusetts. This is the address of the Shipyard property itself. In total, Emmanuel established (1) MHI; (2) MHI Shipbuilding; (3) MHI Shipyard Operators and Consultants, LLC; (4) Heben Holdings Co. Limited, LLC; (5) Marine Industrial Services, LLC; (6) MHI Management, LLC; and (7) Shipyard Holdings, LLC. Emmanuel was the manager, real property signatory, president and/or chief executive officer for each of these corporations. Some of these corporations were established as wholly owned subsidiaries of other related corporations, but in all cases these corporations were controlled by Emmanuel. True and accurate copies of all corporate documents on file with the Massachusetts Secretary of State's office are attached hereto as Exhibit 2.

Upon information and belief, none of these corporations were true corporations but were instead the alter ego of Emmanuel. Emmanuel served as the President and Manager of each of these corporations. Upon information and belief, Emmanuel failed to

3

sufficiently capitalize these corporations, to observe corporate formalities, to maintain sufficient reserves to pay the corporations' debts, to make and maintain corporate records, and to otherwise take the steps necessary to preserve the Defendant Corporations as separate from himself.

Upon information and belief, Emmanuel also siphoned corporate assets for personal gain. As an example of Emmanuel's failure to observe the proper separation between his personal and his corporate affairs, upon information and belief, Emmanuel, through one of his Shipyard-related companies (Marine Industrial Services, LLC), borrowed $1.8 million from Fleet Bank. The Fleet Bank money was used to purchase his residence, located at 130 Goddard Avenue in Brookline, Massachusetts. That residence was purchased by Emmanuel for a little over $2 million in 1998. Emmanuel's name individually was on the deed to the residence, but Marine Industrial Services, LLC was obligated to repay the Fleet Mortgage. The house was sold in September, 2000 for approximately $700,000, an apparent gain of $500,000. True and accurate copies of documents related to this transaction are attached hereto as Exhibit 3. None of that money was used to repay any of the City Loan on the Fore River Shipyard.

Emmanuel and the Defendant Corporations did not complete the renovation of the Shipyard and never engaged in any shipbuilding at the Shipyard. Upon information and belief, Emmanuel never had the reliable contractual commitments or other financial resources that he claimed he had to make the Shipyard renovation project a success even when he made promises to the City to the contrary. In March 2000, Emmanuel failed to make the first principal and interest payment due under the Note and the City sent the Defendants a Notice of Default in accordance with the Financing Documents. A true and

accurate copy of the City's Notice is attached hereto as Exhibit 4. Shortly thereafter, in 2000, Defendants MHI and MHI Shipbuilding filed for bankruptcy protection in the Federal Bankruptcy Court in Boston, Massachusetts. The bankruptcy petition was voluntarily dismissed in March 2002. True and accurate copies of the bankruptcy dismissals are attached hereto as Exhibit 5. The City has never received any payment due under the Financing Documents. See Affidavit of Richard Fitzpatrick, attached hereto as Exhibit 6.

In May, 2004, the City was notified that approximately $650,000 in stock certificates owned by Emmanuel in Universal Guardian Corporation ("UGC") were located in Los Angeles, California. See Affidavit of Michael J. Skellern, attached hereto as Exhibit 7. These stock certificates can be claimed by Emmanuel at any time. With respect to the Shipyard Project at the very least, Emmanuel has a history of non-payment and removing himself and his assets from the jurisdiction. If the City is to have any chance of recovering any of the $7.8 million in public funds which Emmanuel owes, the City needs to have these stock certificates attached.

**ARGUMENT**

I. The City Is Entitled to A Temporary Restraining Order Prohibiting the Transfer or Disposition of Emmanuel's UGC Stock.

At this time, the City requests that this Court enter a temporary restraining order ("TRO") and/or preliminary injunction prohibiting the transfer or disposition of Emmanuel's UGC stock certificates.

Under Fed.R.Civ.P. 65(b), a temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney if: "(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and

5

irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." That rule continues, "[i]n case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order."[1]

In this case, the City has provided an affidavit, a motion, this memorandum in support of that motion, and a Complaint reciting facts demonstrating that Emmanuel has failed to perform his obligations under his agreements with the City and that he has purposefully fled Massachusetts and, upon information and belief, the United States. The City has further stated that it has served Emmanuel, by mail, at the addresses agreed to for service of process under the Financial Documents. The City states that Emmanuel has assets located in California, that those assets can be removed without substantial time or effort by Emmanuel, that the City has tried to effect service on Emmanuel as agreed, that Emmanuel has avoided that service by allowing the location to be sold under a power of sale by MARAD to another entity, and that the City will be harmed if these assets are removed from the United States.

---

[1] This rule also requires that the party moving for the temporary restraining order supply to the court such bond as the court deems necessary.

Because the City has alleged facts, and provided an affidavit, sufficient to meet the requirements of Fed.R.Civ.P. 65(b), the inquiry then moves to the next stage where the movant for a temporary restraining order is subject to the same standard that would apply if the movant were seeking a preliminary injunction. *See Planned Parenthood League of Massachusetts v. Belotti*, 641 F.2d 1006 (1st Cir. 1981); *Largess v. Supreme Judicial Court For State of Massachusetts*, 2004 WL 1068877 at *2 (D. Mass. 2004). That standard comprises four elements: (1) the likelihood of success on the merits; (2) the potential for irreparable injury; (3) a balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and (4) the effect on the public interest of a grant or denial. *See McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991).

As demonstrated below, this standard entitles the City to the relief it seeks.

II.   The City Is Likely to Succeed on the Merits.

   A.   Defendants MHI and MHI Shipbuilding Owe the City More than $7.8 Million.

There is really no doubt that MHI and MHI Shipbuilding owe the City $7.8 million, plus interest, penalties, costs and fees. In December 1997, Emmanuel, through MHI and MHI Shipbuilding, entered into a series of agreements and contracts with the City and other public entities through which MHI and MHI Shipbuilding borrowed over $50 million dollars. Through these agreements, the City loaned MHI Shipbuilding $7.8 million dollars to be used to commence shipbuilding at the Fore River Shipyard and MHI agreed to repay that money over time. Repayment of the City Loan was not contingent upon some other event and the repayment obligations were not ambiguous and MHI was

an unconditional guarantor. See Exhibit 1. Since the City entered into those agreements, no shipbuilding has commenced at the Shipyard and not a single payment has been made to the City to repay the loan.

Based on the Financing Documents, it is clear that MHI and MHI Shipbuilding have defaulted on their loan obligations. There is thus a virtual certainty that the City will be successful on the merits of this claim against MHI and MHI Shipbuilding in an amount that exceeds $7.8 million.

B. <u>The City Is Likely To Succeed in Its Claim that the Corporate Veil Should Be Pierced to Reach Assets of Defendant Emmanuel.</u>

Under the standard Massachusetts criteria for piercing the corporate veil, Emmanuel is personally responsible for the debts and liabilities of MHI and MHI Shipbuilding. *See, e.g., Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985), citing *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968). The City is aware of seven different corporations that Emmanuel personally established in Massachusetts and elsewhere. For MHI, Emmanuel had served as the President, Treasurer, Clerk and the sole Director at one point in time, and throughout its existence, has always served as its President, Treasurer, and Director. For MHI Shipbuilding, Emmanuel was identified in corporate papers filed in Massachusetts as the real estate signatory and executed the Financing Documents as its President. MHI Shipbuilding and MHI Management, LLC, both Delaware corporations, identified another Emmanuel corporation, Shipyard Holdings, Inc., as the corporate manager in Massachusetts. Shipyard Holdings, Inc., also a Delaware corporation, identified Emmanuel as its signatory and Heben Holdings, Co. Ltd as its Manager in Massachusetts. Heben Holdings, in turn, is a Greek corporation with Emmanuel as its

8

director and assistant secretary. See Exhibit 2. Emmanuel was therefore the "dominant figure" in the whole enterprise. See *My Bread*, 353 Mass. at 620. Statements made as to the purpose of these corporations filed with the Massachusetts Secretary of State's Office indicate that all of these corporations were to enlarge, repair, equip, contract for and aid in the construction, repair and selling of ships.

Based upon the City's review of documents from the Secretary of State's office, none of these corporations has filed annual reports, nor have they filed annual registration with the Massachusetts Secretary of State since 2000, and none has filed articles of dissolution. Upon information and belief, these corporations are all now defunct but have not taken the necessary steps to wind up their corporate affairs. The City is thus likely to demonstrate that there was a "confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities." *Pepsi-Cola*, 754 F.2d at 15.

Emmanuel is also personally liable for the debts and liabilities of MHI and MHI Shipbuilding because he did not maintain the necessary separation between his private and corporate affairs. See *Evans v. Multicon Constr. Corp.*, 30 Mass.App.Ct. 728, 733 (1991). Upon information and belief, Emmanuel, through Marine Industrial Services, LLC (another Delaware corporation whose Massachusetts registration statement identifies Emmanuel as the Manager), borrowed $1.8 million from Fleet Bank to purchase Emmanuel's residence located at 130 Goddard Avenue in Brookline, Massachusetts for a little over $2 million in 1998. Emmanuel's name individually was on the deed to the residence, but Marine Industrial Services, LLC was obligated to repay the Fleet Mortgage. See Exhibit 3. The house was sold in September, 2000 for

approximately $700,000, an apparent gain of $500,000. None of that money was used to repay any of the City Loan on the Shipyard. See Exhibit 6. This intermingling of private and corporate affairs to the detriment of the public is exactly the type of conduct which justifies piercing the corporate veil under *My Bread*.

Moreover, Emmanuel is personally liable for tortious misleading statements made to the City even if this Court chooses not to pierce the corporate veil. See, e.g., *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230 (1953); *Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 752-53 (1999) ("a corporate officer is personally liable for a tort committed by the corporation . . . if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party"). The City is likely to succeed in showing that Emmanuel, as the spokesperson and primary actor on behalf of MHI Shipbuilding and MHI, led the City to believe that contractual commitments had been made that would have enabled the Shipyard to succeed. His failure to use reasonable care in conveying to the City the financial resources and commitments he had lined up to support the renovated Shipyard was a material misrepresentation and induced the City to make a loan it otherwise would not have made. *See Restatement (Second) of Torts*, §551 (One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so. *Townsends*, 47 Mass. App. Ct. at 752.

III.    <u>Irreparable Harm.</u>

Emmanuel has accepted more than $50 million in money from public entities and on information and belief has not repaid any of that money. On information and belief, Emmanuel has instead left the United States, has purposefully evaded the jurisdiction of the United States, and has generally removed his assets from the United States. If this Court does not ensure that the UGC stock certificates, and any other assets of the Defendants, remain in the United States, there is a high likelihood that all of those assets will be removed from the Unites States and that, if the City is successful in this lawsuit, there will be no assets available to satisfy a judgment against Defendants. The City will be substantially harmed if it cannot collect the judgment it is owed and a substantial amount of public money will be lost.

IV.    <u>Balancing of the Equities.</u>

Because Emmanuel has evaded his, and his companies', responsibilities under his agreements with the City and because the asset that the City seeks to have frozen is worth only a fraction of the amount owed to the City, this Court should find that there is no substantial harm to Emmanuel in freezing his U.S. assets. Moreover, because the harm that has been done to the City would be so great if Emmanuel were permitted to eliminate its remedy, the Court should, on balance, find that an injunction should enter.

V.    <u>The Public Interest.</u>

The public interest in the outcome of this case is overwhelming. The Defendants have deprived public entities of over $50 million in public funds and have deprived the City of Quincy of more than $7.8 million. The City of Quincy is deprived of its federal CDBG money which is used to support affordable housing and small business

investments in the community, the Shipyard has not been revitalized, and there has been not a single repayment of the money the City has loaned to Defendants. The public interest in this case clearly weighs in favor of granting an injunction.

VI.   This Court Has the Power to Enjoin the Seizure, Transfer or Disposal of Emmanuel's UGC Stock Pending the Resolution of This Case.

On information and belief, currently located in Los Angeles, California are approximately $650,000 in UGC stock certificates owned by Emmanuel. This Court has the authority to attach this stock preliminarily pending the outcome of this case. Fed.R.Civ.P. 64 makes state law control the availability of remedies to secure satisfaction of a judgment and specifically provides that the remedies include "arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies." As a Massachusetts District Court has discussed in a similar case, the phrase "and other corresponding or equivalent remedies . . ." has not been interpreted to exclude temporary equitable relief otherwise proper under Fed.R.Civ.P. 65, even though that relief operates only to secure satisfaction of a final judgment and state law offers no equivalent remedy. *Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc.*, 475 F. Supp. 973 (D. Mass. 1979), *citing* 7 *Moore 's Federal Practice* P 64.04(3). Under this interpretation, a Massachusetts District Court could grant a preliminary injunction seeking to attach stock, despite M.G.L. c. 223, §71, which prohibits the attachment of stock in an action seeking only money damages. *Anderson,* at 977. The *Anderson* court went further, however, and ruled that even if Rule 64 makes state law the exclusive source of available remedies to secure a final judgment, the federal court still had the power to grant the plaintiff's motion to attach stock, relying on M.G.L. c. 214, §3(7), which confers jurisdiction on the Massachusetts Supreme and superior courts in "actions

to reach and apply shares or interests in corporations." *Id.*, at 977-78. The *Anderson* court noted that Massachusetts courts had relied on §3(7) together with their power to issue injunctions *Pendente Lite* to grant plaintiffs equitable attachments of defendants' shares of stock by restraining their transfer prior to final adjudication of plaintiff's substantive claim. *Id*, at 978, *citing McCarthy v. Rogers*, 295 Mass. 245 (1936).

Emmanuel has accepted more than $50 million in money from public entities and on information and belief has not repaid any of the money. On information and belief, Emmanuel has instead left the United States and has purposefully evaded the jurisdiction of the United States. If this Court does not ensure that the UGC stock certificates, and any other assets of the Defendants, remain in the United States, there is a high likelihood that all of those assets will be removed from the Unites States and that, if the City is successful in this lawsuit, there will be no assets available to satisfy a judgment against Defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant the City's motion for a TRO/Preliminary Injunction.

> Respectfully submitted,
> THE CITY OF QUINCY
> By its attorneys,
>
> *Monica E. Conyngham*
> Monica E. Conyngham (BBO #556700)
> Christine M. Griffin (BBO #651401)
> City Solicitor's Office
> Quincy City Hall
> 1305 Hancock Street
> Quincy, MA 02169
> (617) 376-1516

May 26, 2004

I hereby certify that this document was served upon ~~counsel of record~~ for all parties on Date: 5/26/04 by hand/~~by mail~~/~~by fax~~

*Monica E. Conyngham*